**United States District Court**
For the Northern District of California

\*E-filed 3/15/06\*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RICK M. REINHARDT,<br><br>Plaintiff,<br><br>SANTA CLARA COUNTY, SAN JOSE POLICE DEPARTMENT, SANTA CLARA COUNTY PUBLIC DEFENDER, SANTA CLARA COUNTY DISTRICT ATTORNEY, WILL MANION, ENRIQUE GARCIA, ROBERT MAYS, DOROTHY MOTSCHENBACHER, and DOES 1-50,<br><br>Defendants. | Case No. C05-05143 HRL<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |

**I.   INTRODUCTION**

Rick Reinhardt brings claims for damages for "illegal and unconstitutional jailing" against two public entities, two police officers, and two private citizens. He bases his claims on 42 U.S.C. § 1983, the California Constitution, and certain California statutes. The damages stem from the ten months he spent in jail, accused of murder, before authorities figured out he had been framed and released him. Defendants County of Santa Clara (the District Attorney and Public Defender Offices), the City of San Jose,[1] and San Jose Police Officers Will Manion and Enrique Garcia move to dismiss under Fed. R. Civ. P. 12(b)(6). Plaintiff opposes the motions.

---

[1] Erroneously sued as "San Jose Police Department."

## II.   BACKGROUND

According to the complaint, on February 22, 2004, Pete Bianco was robbed and shot to death. His body, which had been hidden in his garage in San Jose, was discovered on February 26. San Jose Police Officers Manion and Garcia began an investigation to identify the killer.

A few days later, Robert Mays, an apparent acquaintance of both the murder victim and Rick Reinhardt, told police that he believed Reinhardt was involved in the crime. Specifically, he said that Reinhardt, who was angry because his former girlfriend was then dating Bianco, told Mays two weeks before the murder that he was going to "cap" Bianco.

Thereupon, San Jose Police conducted surveillance of both of plaintiff's residences (Sunnyvale and Redwood City), obtained search warrants, and on March 1st searched them. Plaintiff, who was at the Redwood City address at the time of the search, "co-operated" with the police about Bianco's murder. (He was arrested at that time on an unrelated warrant.)

The Redwood City search uncovered under plaintiff's mattress a gun,[2] the keys to Bianco's house, and a bag of "white crystals."

Reinhardt was "stunned" to learn about the items under his mattress. He insisted that Bianco was a friend, that he did not own a gun, and that someone—probably Mays—was trying to frame him.[3]

Plaintiff continued to profess his innocence even after "officers" falsely told him DNA, video, and eyewitnesses all placed him at the crime scene. He also did not succumb to their blandishment that he could help himself by acknowledging the killing but explaining it was an accident or self defense.[4]

In the February-March time frame the police interviewed plaintiff's ex-girlfriend, Dorothy Motschenbacher. She said her relationship with Bianco had provoked arguments

---

[2] At the time of the hearing, plaintiff's attorney confirmed that this gun was the murder weapon.

[3] Plaintiff figured Mays was the culprit because he was the "only person" who knew Reinhardt had a Redwood City address and that the door was always unlocked.

[4] The complaint does not say when Reinhardt was charged with murder. Likewise, the court assumes the period of incarceration he complains about was on account of the murder charge and not the result of the "unrelated warrant" mentioned above.

2

between Reinhardt and Bianco.  She confirmed Mays' statements that plaintiff was a violent person who either owned or had access to guns.

At some unspecified point in time, evidence was developed which allegedly should have cast sufficient doubt on Mays' credibility to support the conclusion that Reinhardt had been framed.  For example, unnamed "acquaintances" of Mays told police that he owned guns, shot guns in his garage, and made silencers for guns.  Mays denied shooting in his garage or constructing silencers, and "hesitated and stalled" when asked if he would take a lie-detector test.  Then, at another unspecified time, someone other than the police obtained (and, presumably, turned over to the police) Mays' cell phone records.  Those records showed that on February 28, Mays called Reinhardt (and, presumably, talked to him) while Reinhardt was out of town.  And, the phone records show that Mays' call was made from the Redwood City area (suggesting that Mays might have taken this opportunity to plant the incriminating evidence in plaintiffs' residence).

At some other point, plaintiff's cell phone records were reviewed.  They showed that Reinhardt had called and paged Bianco "dozens of times" in the days after he was murdered and before the body was discovered.  These calls might suggest that plaintiff did not know Bianco was dead,[5] and, if so, that he had not killed him.

Although Motschenbacher initially told police that Reinhardt was violent, she later told them he was "calm and quiet" although "possibl[y]" the killer.  Later still, she said it was "possible" that he had been framed.

In any event, after ten months in jail, plaintiff was released from custody on December 15, 2004.  The police had finally determined that Mays and Motscenbacher conspired to kill Bianco and to frame plaintiff for the murder.[6]

//

//

---

[5] Unless this was an alibi in the making.

[6] The court is advised that Mays and Motschenbacher, named defendants in this action who have not appeared, are currently serving prison terms.  The court has severed these two from the current suit.

3

The gist of plaintiff's complaint is that each of the moving defendants is responsible for an "inadequate investigation, failure to follow legitimate leads, poor accumulation of evidence, and other acts and omissions."[7]

### III. LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the claims stated in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). The motion to dismiss for failure to state a claim is disfavored by courts and is rarely granted, in part because it prevents disposition of a claim on its merits. *See Gilligan v. Jamco Develop. Corp*, 108 F.3d 246, 249 (9th Cir. 1997)

In resolving a Rule 12(b)(6) motion, the court must (1) construe the complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.2d 336, 337-38 (9th Cir. 1996). The court must accept as true not only all material allegations in the complaint, but the reasonable inferences to be drawn from them as well. *Pareto v. F.D.I.C*, 139 F.33d 696, 699 (9th Cir. 1998). However, "the court need not accept as true conclusionary allegations or legal characterizations. Nor need it accept unreasonable inferences or unwarranted deductions of fact." 9 Schwarzer, et al., Cal. Prac. Guide: Fed. Civ. Pro. Before Trial 9-63 (2005).

### IV. DISCUSSION

#### A. Plaintiff's Claims Identified

Plaintiff asserts seven distinct claims: (1) under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment to the United States Constitution, against all the moving defendants; (2) under 42 U.S.C. § 1983 for violation of the Sixth Amendment to the United States Constitution, against Santa Clara County (the District Attorney and Public Defender Offices); (3) for

---

[7] Plaintiff does not challenge the search warrants or his arrest. His focus is on the length of time it took for authorities to satisfy themselves that they had the wrong man.

4

violation of Article I, Section 7 of the California Constitution, against all defendants; (4) for violation of Article I, Section 15 of the California Constitution, against Santa Clara County and the District Attorney and Public Defender Offices; (5) for violation of California Civil Code Section 52.1, against all defendants; (6) for intentional infliction of emotion distress, against defendants Mays and Motschenbacher; and (7) common law negligence, against all moving defendants.

The County of Santa Clara, the City of San Jose, and Officers Manion and Garcia move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

### B.     § 1983 Claims Against the County of Santa Clara

Section 1983 creates a claim against any individual who, acting under the color of law, violates the constitutional rights of another. 42 U.S.C. § 1983. Thus, plaintiff must allege (1) the violation of a right secured by the Constitution or United States law, and (2) that the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Ove v. Gwinn*, 264 F.3d 817, 824 (9th Cir. 2001).

First, it is noteworthy that plaintiff has not sued any individual employees of the county. Instead, he makes claims only against the *offices* of the county Public Defender and District Attorney. Thus, plaintiff's § 1983 claims against the County are governed by the Supreme Court's decision in *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).

#### 1.     *Monell* Liability

This watershed case held that local governmental bodies are considered "persons" for purposes of § 1983, and thus directly liable to suit for compensatory damages and declaratory and injunctive relief. *Id.* at 690. However, the *Monell* court also held that a local government could not be held liable solely because of the acts of an employee—in other words, local governmental liability under § 1983 may not be based on the theory of *respondeat superior*. *Id.* at 691. Rather, to hold a local government liable, the particular constitutional violation complained of must have resulted from the "execution of a government's policy or custom,

5

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id*. at 694.

Thus, in the present case, to state claims against the County, plaintiff must allege that the District Attorney's and Public Defender's Offices had certain policies, customs, or practices that resulted in the violation of his rights. What were they? Plaintiff does not say. Yes, he has alleged that the San Jose Police Department conducted a poor investigation. But, he has pled no facts that (1) tie that allegedly poor investigation with either the District Attorney's or Public Defender's Offices or (2) suggest that the poor investigation was linked to a specific policy or custom of the District Attorney's or Public Defender's Offices.

### 2. The District Attorney's Office as State Actor with Sovereign Immunity

The County argues that the District Attorney's office is a representative of the state, not the county, and thus, the county cannot be held liable for the actions of the District Attorney's Office. Additionally, it contends that, as a state actor, the District Attorney's Office has absolute immunity under the Eleventh Amendment to the United States Constitution.

Whether an official represents the county or the state requires an analysis of state law and the particular function of the official which led to the alleged violations. *McMillan v. Monroe County*, 520 U.S. 781, 785-86 (1997); *Ceballos v. Garcetti*, 361 F.3d 1168, 1182 (9th Cir. 2004). For example, a district attorney's office is considered a state actor when performing functions "intimately associated with the judicial phase of the criminal process." It is considered a county actor when performing "investigative" or "administrative" functions. *Id.*, *citing Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir.2003).

In the present case, plaintiff has alleged no facts (even to support an inference) that the District Attorney's Office was performing investigatory or administrative functions when it allegedly violated his rights. Actually, he does not discuss any actions or inactions of the District Attorney's office at all. Accordingly, the court cannot possibly figure out whether the District Attorney's Office was allegedly acting as a state actor or as a county actor.

//

6

### 3. Public Defender's Conduct "Under Color of Law"

The County next argues that plaintiff has not alleged facts suggesting that the Public Defender's Office acted "under color of law" as required by § 1983.

In *Polk County v. Dodson*, the Supreme Court held that a public defender does not act under color of law "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." 454 U.S. 312, 324-25 (1981). However, the *Polk County* court explicitly stated that it "[did] not suggest that a public defender never acts [under color of state law]." *Id.* For example, a public defender may act under color of law when performing certain administrative and investigative functions. *Id.* at 325. As the Ninth Circuit has held, a "failure [by the public defender's office] to train subordinates may result in § 1983 liability where the failure amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact." *Miranda v. Clark County*, 319 F.3d 465, 471 (9th Cir. 2003), *citing City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

In the present case, however, plaintiff has alleged no facts to support the conclusion that the Public Defender's Office was engaged in investigatory or administrative conduct when it allegedly violated his rights. (In fact, he has, again, alleged no facts at all). In contrast, plaintiff in the *Miranda* case was able to point to specific and concrete investigative policies employed by the Public Defender's Office *before* it undertook to represent the plaintiff. *Miranda*, 319 F.3d at 469-471. Simply pleading the words "color of law" does not suffice. What is it the office (not the individual public defender ) did or did not do? Accordingly, the court cannot determine whether the Public Defender's Office was acting under color of law by performing an administrative, investigative or policy-making function.

For these reasons, plaintiff's § 1983 claims against the County, (District Attorney's Office and the Public Defender's Office) are dismissed with leave to amend.

### C. § 1983 Claims Against the City of San Jose and Officers Manion and Garcia

First, the City argues that plaintiff cannot state a claim for violations of his Fourteenth Amendment rights against the City or the individual officers because plaintiff's arrest was

7

pursuant to a valid warrant and/or probable cause. For this proposition, the city relies on *Baker v. McCollan*, 443 U.S. 137 (1979).

However, *Baker* does not preclude plaintiff's § 1983 claims against the City or the officers. The facts of this case are quite different from those in *Baker*, particularly with respect to the amount of time plaintiff was incarcerated. As one Ninth Circuit court noted, "[d]epending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 683 (9th Cir. 2001), *citing Baker*, 443 U.S. at 145. The *Lee* court continued:

> [T]he loss of liberty caused by an individual's mistaken incarceration 'after the lapse of a certain amount of time' gives rise to a claim under the Due Process Clause of the Fourteenth Amendment. As one court explained, a detainee has 'a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'

*Lee*, 250 F.3d at 683-84 (internal citations omitted).

Accordingly, plaintiff has a viable legal theory that the City defendants violated his due process rights under § 1983. However, to successfully plead a claim, plaintiff must allege sufficient facts to support them.

### 1. Factual Allegations Implicating the Individual Officers

Although painfully sketchy, particularly as to the chronology of events, plaintiff has alleged sufficient facts to state a §1983 claim against officers Manion and Garcia. Defendants' motion as to them is denied.

### 2. Factual Allegations Implicating the City

As discussed above, claims against a municipality under § 1983 are governed by the Supreme Court's decision in *Monell*. 436 U.S. 658 (1978). To state a claim against the City, plaintiff must allege that the City had a certain policy, custom, or practice that led to the violation of his rights. *Id*. at 694. While, unlike the County, the City is linked to the officers' conduct by virtue of their employment with the Police Department, plaintiff has not alleged any facts pointing to a particular City policy, custom, or practice that resulted in the alleged

8

constitutional violations. What was the policy, custom, or practice—if any—that implicates the City?

Accordingly, plaintiff's § 1983 claim against the City is dismissed with leave to amend.

### D.     State Law Claims Against All Defendants

#### 1.     California Civil Code § 52.1

California Civil Code Section 52.1, also known as the Bane Act, makes it unlawful for:

> [A] person or persons, whether or not acting under color of law, [to] interfere[] by threats, intimidation, or coercion, or attempt[] to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or law of this state.

Section 52.1 requires a two prong showing: (1) an attempted or completed act of interference with a legal right; (2) accompanied by a form of coercion. *Jones v. Kmart*, 17 Cal. 4th 329, 334 (1998).

Plaintiff has made some allegations that he was threatened, coerced, and/or intimidated in several ways: (1) he was arrested and incarcerated for ten months in the county jail; (2) the officers told him that they had DNA evidence, an eyewitness, and video tape placing him at the scene of the crime; and (3) the officers offered plaintiff a "way out" by giving him the opportunity to say he killed Bianco in self-defense.[8] Plaintiff impliedly asserts that this use of force and/or coercion violated his constitutional rights.

The allegations of coercion stated in plaintiff's complaint implicate only the individual police officers. Plaintiff has alleged no facts to suggest that the County (the District Attorney's or Public Defender's Office) threatened, coerced, or intimidated him in any way.

Accordingly, plaintiff's § 52.1 claims against the County are dismissed with leave to amend.[9]

---

[8] In his opposition papers, plaintiff claims that "he was told that innocent people go to jail every day and that there was more evidence against him than against another famous defendant, Scott Peterson." However, even assuming that the court could discern which defendant is responsible for these statements, the court is precluded from considering "new" facts alleged for the first time in plaintiff's opposition papers. *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 (9th Cir. 1997).

[9] The City defendants did not move to dismiss the § 52.1 claims against them. Accordingly, the court has not addressed those claims here.

9

### 2. Negligence

#### i. Negligence Claim Against the City and County

Plaintiff alleges a claim for negligence under Cal. Gov. Code § 815.2(a), which provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment."

Defendants challenge plaintiff's negligence claims on several fronts. First, they assert that because § 815.2(a) provides for *respondeat superior* liability, it does not support claims against public entities for failure to adequately train and supervise employees, which is an assertion of direct liability. Therefore, if plaintiff's negligence claims survive, they may only be brought against the public entities for actions committed by the individual officers within the scope of their employment. Second, defendants argue that a separate statute, Cal. Gov. Code § 815, protects public entities from tort liability unless based on a specific statute declaring them to be liable or creating a duty of care. They argue that because plaintiff has asserted no separate statutory basis for liability, his negligence claims must fail.

Plaintiff counters that he has alleged a separate statutory basis for liability against the government agencies: § 851.2, the respondeat superior statute.

In *Eastburn v. Reg'l Fire Protection Auth.*, the California Supreme Court confirmed that a claim of direct liability against a government entity for negligent acts must have a specific statutory basis. 31 Cal. 4th 1175, 1181 (2003). In the present case, plaintiff is unable to point to any specific statute imposing direct liability on a public entity for failure to train and supervise its employees. Section 815.2 only imposes vicarious liability on public entities, making them liable for the negligent acts of employees. Failure to train, however, is a "direct" act on the part of the entity, not on the part of the employee. *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1113 (2004). Accordingly, plaintiff's negligence claims against the City and County for failure to train are dismissed. Those entities may only be liable if it is found that their employees acted negligently within the scope of their employment. Moreover, because Officers Manion and Garcia are employees of the City, the County can have no liability even if it is found that those officers acted negligently.

10

### ii. Negligence Claim Against the Individual Officers

Defendants argue that pursuant to Cal. Gov. Code § 821.6, the officers are immune from liability. That statute holds: "A public employee is not liable for injury cased by his initiating any judicial or administrative proceeding within the scope of his employment even if he acts maliciously and without probable cause." CAL. GOV. CODE § 821.6. Defendants argue that the conduct of the officers complained of by plaintiff occurred during their initiation of a judicial proceeding.

Cal. Gov. Code § 826.1 protects officers from liability for claims of malicious prosecution. *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir. 1998). A claim of malicious prosecution, however, is distinct from a claim of negligence such as the one raised by plaintiff in the present case. Plaintiff's negligence claim against the officers is similar to the negligence claim raised in the *Martinez* case. That court's reasoning is instructive:

> With regard to the false imprisonment claim grounded on prolonged detention . . . Martinez correctly points out that a jailer has a duty to investigate the validity of an incarceration after sufficient notice. *Sullivan [v. County of Los Angeles]*, 12 Cal.3d [710] at 719 [(1974)]. . . . It is a similar duty, predicated upon the special relationship between the LAPD and Martinez, which gives rise to Martinez's false imprisonment claim grounded on prolonged detention. Martinez has presented evidence of negligence sufficient to create a genuine issue of material fact as to this claim.

*Martinez*, 141 F.3d at 1381.

Likewise, in the present case, plaintiff has stated a claim against Officers Manion and Garcia for negligence. Moreover, pursuant to Cal. Gov. Code §. 815.2(a), the City may be liable for the conduct of the officers under the doctrine of *respondeat superior*.

Accordingly, plaintiffs negligence claims against the City and County for failure to train and supervise are dismissed with leave to amend. Defendants' motion regarding the claims against the individual officers is denied.[10]

//

//

//

---

[10] The City did not specifically move to dismiss the negligence claim against it. As noted above, the negligence claim against the City under a theory of *respondeat superior* remains intact.

11

### 3. Claims Under the California Constitution

Article 1, § 7(a) of the California Constitution reads that "[a] person may not be deprived of life, liberty, or property without due process of law or denied equal protection under the laws."

Article 1, § 15 of the California Constitution provides that a "defendant in a criminal cause has the right to a speedy public trial, to compel attendance of witnesses in the defendants's behalf, to have the assistance of counsel for the defendant's defense, to be personally present with counsel, and to be confronted with the witnesses against the defendant."

Defendants challenge plaintiff's claims under the California Constitution, arguing that the provisions do not create an independent right to sue for damages. The County relies on *Katzberg v. Regents of Univ. of California*, in which the California Supreme Court declined to recognize a constitutional tort to remedy the asserted violation of Art. 1, § 7(a) in the absence of a statutory provision or common law tort authorizing such a remedy. 29 Cal.4th 300 (2002).

Plaintiff counters that the *Katzberg* case did not preclude all claims under this provision of the state constitution.  Rather, that case set out a framework to determine whether damages are appropriate. *Katzberg*, 29 Cal.4th at 317. Under the *Katzberg* test, a court considering this question must: (1) look at the language and history of the provision for an affirmative intent to authorize a claim for damages; (2) in the absence of such affirmative intent, consider whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision; (3) if these factors weigh against the recognition of a right to damages, the inquiry ends.  If, however, the factors weigh in favor of recognizing such a right, the court should also consider any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgement, avoiding of adverse policy consequences, considerations of government fiscal policy, practical issues of poof, and the competence of courts to assess particular types of damages. *Id.* at 317.

The *Katzberg* court determined that the words and history of Art. 1, § 7(a) of the California Constitution manifest no intent to create an independent damages remedy. *Id.* at

12

1  318-324.  It further held that because there were alternative remedies available to the plaintiff, it
2  would not recognize a constitutional tort to remedy the violation of the state constitutional due
3  process clause.  *Id.* at. 328.  Similar to that case, the plaintiff here has alternative remedies
4  available under the Bane Act (Cal. Civ. Code § 52.1), habeas corpus, and 42 U.S.C. § 1983.
5  And, although due process rights are fundamental, creating a new cause of action would
6  substantially alter established tort law in California, which to this date has not recognized such a
7  claim.   For these reasons, and because plaintiff has offered no argument as to why the *Katzberg*
8  analysis should reach a different result in this case, this court agrees with the *Katzberg* court
9  that, under the facts alleged here, there is no constitutional tort cause of action for damages to
10 remedy an asserted violation of plaintiff's due process rights under Article I, Section 7(a) of the
11 California Constitution.  Accordingly, plaintiff's claims based on that provision are dismissed.

12 Plaintiff's claims under § 15 are likewise precluded. One court in this district which
13 considered an identical claim granted a 12(b)(6) motion to dismiss because the provision does
14 not manifest an intent to include a damages remedy, and because there are adequate alternative
15 forms of relief (habeas corpus and the Bane Act).  *Walker v. County of Santa Clara*, 2005 WL
16 2437037 at *7 (N.D. Cal. 2005).  Because plaintiff offers no cogent arguments to the contrary,
17 this court agrees with the *Walker* court that, under the facts presented here, there is no
18 constitutional tort cause of action for damages to remedy plaintiff's asserted violation of rights
19 under Art 1, § 15 of the California Constitution.  Accordingly, plaintiff's claims based on that
20 provision are dismissed.

21 **V.    CONCLUSION**

22 For the foregoing reasons, the court grants in part and denies in part defendants' motions
23 to dismiss as follows:

24 Granted as to § 1983 claims against the County, the District Attorney's Office, and the
25 Public Defender's Office;

26 Denied as to § 1983 claims against Officers Manion and Garcia;

27 Granted as to § 1983 claim against the City;

28 Granted as to § 52.1 claims against the County.

13

1  Denied as to § 52.1 claims against the Officers Manion and Garcia.

2  Granted as to negligence claims against the City and County for failure to train and
3  supervise.

4  Denied as to negligence claims again the Officers Manion and Garcia, as well as against
5  the City under *respondeat superior*.

6  Granted as to all claims under California Constitution.

7  Plaintiff shall have 30 days to file an amended complaint with respect to all dismissed
8  claims.

9  **IT IS SO ORDERED.**

10  Dated: 3/15/06                                     /s/  Howard R. Lloyd
                                                      HOWARD R. LLOYD
11                                                    UNITED STATES MAGISTRATE JUDGE

1  THIS IS TO CERTIFY THAT A COPY OF THIS ORDER WILL BE SENT TO:

2  Robert Baker Burchfiel        CAO.Main@ci.sj.ca.us

3  David Michael Rollo           david.rollo@cco.sccgov.org, anna.espiritu@cco.sccgov.org

4  Loren Bryan Vaccarezza        lorenbvaccarezza@yahoo.com

5  Dated: 3/15/06

                                                      /s/ RNR

6                                  Chambers of Magistrate Judge Howard R. Lloyd

**United States District Court**
For the Northern District of California